IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MEE O. SANDERS,

                Plaintiff,           Case No. 3:05 CV 7056

-vs-

                                     MEMORANDUM OPINION

DAIMLERCHRYSLER CORP.,

                Defendant.

KATZ, J.

This matter is before the Court on Defendant's motion for summary judgment (Doc. No. 64, 97) and Plaintiff's opposition thereto (Doc. No. 89, 94). For the following reasons, the Court hereby grants partial summary judgment but denies summary judgment with regard to Plaintiff's sexual harassment claims.

**I. Background**

DaimlerChrysler ("Defendant") hired Mee O. Sanders ("Sanders" or "Plaintiff") as a temporary employee in March 1996. Sanders Depo. at 39. Sanders obtained full time status and accrued seniority with the Jeep Unit of the United Automobile, Aerospace, Agricultural Implement Workers of America, Local 12, Region 2B ("Union") on May 1, 1997. Sanders Depo. at 40.

Sanders began dating Richard Lott ("Lott"), another hourly bargaining unit employee of DaimlerChrysler in January 2001. Sanders Depo. at 38, 94. Lott is one of the three union stewards elected to represent the employees of the Assembly department at DaimlerChrysler's Toledo North Assembly Plant ("TNAP"). Sanders Depo. at 88.

In March 2003, Sanders first informed Lott that she did not wish to continue their relationship. Sanders Depo. at 115. Sanders testified that after she told Lott that she did not wish to continue their relationship in March 2003, "he kept holding my job over my head saying that, well, you know, I can do something to your job," Sanders Depo. at 113, and made other harassing and threatening calls and comments. *Id.* at 112-14.

Sanders was laid off from August 31, 2001 through March 24, 2002, because there was no work available in the Paint department. Maxon Affidavit, Exh. A at DC-75. When she was reinstated on March 25, 2002, Sanders was temporarily transferred from the Paint department to the Body Shop department under a "manpower requisition," meaning that there were available jobs in the Body Shop but not the Paint department. Sanders Depo. at 48; Maxon Affidavit, Exh. A, at DC-191.

Sanders sustained an injury to her left shoulder while working in the Body Shop on May 23, 2002 and became subject to certain medical restrictions. Sanders Depo., Def. Exh. D. Sanders took an inverse layoff from October 18, 2002 through November 4, 2002 and when she returned, the plant physician imposed a restriction that prohibited Sanders from using her left upper extremity at all while working. Sanders Depo., Def. Exh. E, DC-201.

After a period without work and a series of medical examinations yielding work restrictions, Sanders reported to TNAP in March, 2004, and she was given a copy of a Notice of Return to Work, which reflected a temporary transfer from the Body Shop to the Assembly department. Sanders Depo. at 356-357, 730; Hudak Depo., Pl. Exh. 15. Sanders then reported to the engine line, team three, and submitted the Notice of Return to Work to the line advisor, John Zapf ("Zapf"). Sanders Depo. at 361, 362. Sanders learned that the job she had expected to be

2

placed on had been assigned to an employee from the Assembly department. Henneman Depo.; Pl. Exh. 26, 102.

The Area Manager of the Assembly Department, Torrence Frazier ("Frazier"), testified that he received several calls at the beginning of the shift from PQX employees from the Assembly Department who were complaining that an employee from the Body Shop was being placed on jobs before they were placed. Frazier Affidavit ¶3. Defendant states that placement of an employee from another department in Assembly when Assembly employees had not yet been placed would violate the placement procedure in the collective bargaining agreement. Frazier Affidavit, ¶4, Sanders Depo., Def. Exh. C. Later, Frazier received a call from Zapf, who told him that Sanders had reported to the Assembly department and asked to be placed on an available job, but Frazier told Zapf to send Sanders back to the PQX Coordinator. Frazier Affidavit ¶5; Sanders Depo. at 363. Frazier then called the PQX Coordinator and confirmed that there were PQX employees from the Assembly department who had not yet been placed. Frazier Affidavit ¶6. Sanders testified that Frazier responded "Oh, hell no," upon hearing of Sanders' potential placement on the engine line. Sanders Depo. at 365. Sanders also asserts that Frazier has a history and habit of harassing female employees, resulting in litigation by at least three other women. Plaintiff's Br. at 9-10.

Sanders filed a grievance on March 22, 2004 as a result of not being permitted to return to work on the engine line in the Assembly department, asserting that she should have been placed on a job according to her restrictions and seniority. Sanders Depo. at 375, 378; Def. Exh. O. Sanders' union steward, Dan Henneman, signed the grievance and asked Mike Toney, the Area Manager for the Body Shop, whether there was any work available for Sanders in the Body Shop.

Henneman Depo. at 115; Sanders Depo., Def. Exh. O. Toney told Henneman there were no available jobs and Henneman submitted the grievance to the chief steward for processing. Henneman Depo. at 115.

Nick Weber, a labor relations representative, wrote DaimlerChrysler's response to Sanders' grievance. The Company's response was:

> Relief requested for pay for the week of 3/22 through 3/26 denied. Grievant was informed by this writer (Nick Weber) of Labor Relations on Monday 3/22 that the Return to Work was void because the department KJ Assembly was over roll. On several occasions that week this writer informed the grievant that I was looking for work and that she was not being paid as she was not on the active roll. That notwithstanding, Area Manager Mike Toney and this writer reviewed the jobs in grievant's home department. As a low seniority floater, the grievant would not be able to perform jobs as required. Grievance denied. Labor Relations and PQX facilitators will continue to seek placement within grievant's restrictions.

Sanders Depo., Def. Exh. O.

On July 14, 2004, Sanders filed a charge of discrimination with the OCRC alleging sex discrimination based upon the denial of a place for her in the Assembly department in March 2004. Sanders Depo. at 383; Def. Exh. P. In her charge, Sanders accused Lott of taking actions to prevent her from returning to work because she would not reunite with him. Sanders Depo., Def. Exh. P. Sanders alleged that Frazier made the decision that Sanders could not be placed in the Assembly department, and further alleged that Frazier and Lott were friends. Sanders amended the charge in August 2004 to include a charge of retaliation. Sanders Depo., Def. Exh. P. The EEOC issued a right to sue letter on September 9, 2004. Sanders Depo., Def. Exh. P.

Sanders worked from October 2004 through May 2005 without incident. Then, around May 9, 2005, Lott was rotated to the area in which Sanders was working. Lott testified that he was aware that he would be representing employees in the area where Sanders worked, so he

4

informally sought advice from a group of management and union officials who were gathered in the labor relations department about how he should best deal with Sanders in light of the fact that Sanders had filed a charge of discrimination accusing him of preventing her from returning to work. Lott was advised to treat Sanders the same way he would treat any other co-worker. Hathaway Depo. at 52, 53, 55; Lott Depo. at 14.

As part of his duties as a union steward, Lott walked down the production lines and greeted each of the workers and checked to see if anyone had a concern to bring to his attention. Drill Affidavit, ¶3. On May 10, 2005, Lott and Sanders' supervisor, Aaron Drill, walked by Sanders to greet her. Lott Depo. at 12; Drill Affidavit ¶4. Drill approached Sanders and asked her whether she was okay with Lott speaking to her; Sanders replied that it was not. Drill Affidavit ¶5. Defendant asserts that before Drill could instruct Lott not to speak to Sanders, Lott walked by, waved at Sanders, and said, "Hi, Mee." Drill Affidavit ¶6. Sanders describes the event differently; according to Sanders, Lott walked up behind her and surprised her by "lunging" at her, waving his right arm in a threatening manner and "yelling" "Hi, Mee." Sanders Depo. at 505; Def. Exh. S. Lott was near her for about 15 seconds. Sanders Depo. at 504.

Sanders reiterated to Drill that she did not want Lott to speak to her, and Drill told Sanders that Lott had been advised to treat Sanders the way he treated all other employees. Drill Affidavit ¶7; Sanders Depo. at 507, 514. Sanders demanded that Drill arrange a meeting with labor relations and the Union. Drill Affidavit ¶8; Sanders Depo. at 514; Def. Exh. S. Sanders then used her cellular telephone to call the union committee room, the labor relations department, a representative at the EEOC, a representative at the NLRB, a Toledo Police officer with whom she was acquainted, her attorney, union official Mark Epley, and the security department at

DaimlerChrysler. Sanders Depo. at 510-512. Drill told Lott that Sanders did not want him to speak to her and Lott agreed that he would not speak to Sanders again. Drill Affidavit ¶9.

After Sanders called the labor relations office, labor relations representative Tracy Relue ("Relue") arranged a meeting with Sanders, Drill, Mark Epley (the Jeep unit secretary-treasurer), and Patty Hudak (union steward) in the labor relations department. Sanders Depo. at 516. Sanders explained that she understood when she returned to work in October 2004 that Lott would not be permitted to speak to her and that by allowing Lott to speak to her, DaimlerChrysler had created a hostile work environment. Sanders Depo. at 517; Relue Affidavit, Exh. A at DC-2874. Sanders stated that she did not have a problem with Lott being in her work area so long as he did not speak to her. Relue Affidavit, Exh. A at DC-2874. After the meeting, Sanders returned to her job and worked the balance of her shift without incident. Sanders Depo. at 518.

On July 25, 2005, the first shift Sanders worked after a civil protection order ("CPO") hearing before the Lucas County Court of Common Pleas, one of Sanders' co-workers, Helen Pawlicki, summoned Lott to her work area. Sanders Depo. at 559, 598. Pawlicki, who was working about two feet away from Sanders, talked to Lott for about two to three minutes. Sanders Depo. at 561-562. Lott did not speak to Sanders, but Sanders alleges that she feared for her safety because Lott had been standing "too close" to her. Sanders Depo. at 563, 571. When Lott walked away, Sanders, who had been talking to a friend on her cellular telephone, ended the call with her friend and immediately called 911 and asked the Toledo Police to send a crew to TNAP. Sanders Depo. at 575-577. A police crew responded and took a statement from Sanders. Weber also took a statement from Sanders in the presence of Henneman, Epley, a TNAP security officer and the

6

Toledo Police officers. Sanders was released from duty for the rest of her shift and she called a friend to drive her home because she was too upset to drive. Sanders Depo. at 595, 597.

Weber investigated the events of that evening by interviewing several employees who had been working in the area when Lott was talking to Pawlicki. Hudak Depo. at 45-53; Hathaway Depo., Pl. Ex. 4 at 018. In a later interview, Pawlicki said that Lott had not even been within arms' reach of Sanders on July 25, 2005. Weber Affidavit, Exh. B at DC-2888-89.

When Sanders reported to work the following day, Weber and Epley told her to take the day off and that she would meet with TNAP's local response team the next day. Sanders Depo. at 595-600. After a very emotional meeting, DaimlerChrysler decided to transfer Sanders to the Paint department, where she would not have any contact with Lott. Henneman Depo. at 26; Sanders Depo. at 610-611. Sanders filed a grievance to protest being transferred to the Paint department on August 1, 2005. Sanders Depo. at 548, 651-652; Def. Exh. V; Hudak Depo., Pl. Ex. 13. Sanders filed this suit on December 6, 2005. Doc. No. 1.

## II. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The movant

may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### III. Discussion

**A. Timeliness of the Disability Discrimination Claim**

Defendant asserts that Plaintiff's disability discrimination claim is time-barred by a clause in Plaintiff's application for employment that reads as follows:

> In consideration of Chrysler's review of my application, I agree that any claim or lawsuit arising out of my employment with, or my application for employment with Chrysler Corporation or any of its subsidiaries must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit. While I understand that the statute of limitations for claims arising out of an employment action may be longer than six (6) months, I agree to be bound by the six (6) month period of limitations set forth herein and I WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY.

(Sanders Depo., Def. Exh. A.)

Such clauses are enforceable in this Circuit. *See Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352 (6th Cir. 2004). Defendant argues that Plaintiff did not assert her claim that she was unlawfully excluded from the place of employment until December 3, 2003, longer than six months after the alleged exclusion on March 24, 2003. Defendant's Br. at 24-25. Therefore, Defendant argues that Plaintiff's claim related to the March 2003 layoff is barred by the employment application language. This Court agrees, and hereby dismisses Plaintiff's claim of disability discrimination because that

9

claim is based solely on events that took place, at the latest, eight to nine months before that claim was asserted.

**B. Employment Discrimination Based on Gender**

Defendant alleges that Plaintiff's claim of employment discrimination based on gender (Count II) should be dismissed because (1) the claim is barred by the 6-month limitation language of the employment application, (2) there is no direct evidence of discrimination, no prima facie case of discrimination, and no showing of pretext, and (3) Plaintiff abandoned Count II because Plaintiff's brief does not set forth facts or law to support its claim of employment discrimination. Defendant's Br. at 25-29, Defendant's Reply Br. at 2. Adhering to the narrowest grounds presented, this Court hereby dismisses Plaintiff's claim of employment discrimination based on gender because Plaintiff did not brief the argument, although it briefed Counts I and III, in its memorandum in opposition to summary judgment (Doc. No. 89, 94).

**C. Sexual Harassment**

The Court hereby denies Defendant's motion for summary judgment with regard to Plaintiff's claims of sexual harassment because genuine issues of material fact exist. Courts recognize two types of sexual harassment claims: (1) harassment that creates an offensive or hostile work environment, and (2) quid pro quo harassment, whereby a supervisor demands sexual favors as a condition for job benefits. *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178 (6th Cir. 1992), *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618 (6th Cir. 1986), *Yates v. Avco Corp.*, 819 F.2d 630, 634 (6th Cir. 1987). While the Supreme Court has instructed that "the labels quid pro quo and hostile work environment are not controlling for purposes of establishing employer liability," they are still relevant to the "threshold question [of] whether a plaintiff can prove

discrimination in violation of Title VII." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753, 765 (1998). Here, Plaintiff has alleged both forms of sexual harassment, and there are genuine issues of material fact with regard to both claims.

**1. Quid Pro Quo Harassment**

In order to establish a claim for quid pro quo sexual harassment, a plaintiff-employee must prove:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

*Kauffman*, supra at 186.

Defendant argues that Lott, as a union steward, was not a "supervisor" within the meaning of sexual harassment law. Def. Br. at 31. An alleged harasser may be a "supervisor" if he or she has significant control over such employment conditions as hiring, firing, discipline, discharge, and setting work schedules and pay rates. *Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998); *Kauffman*, supra at 186. However, "[t]he supervising employee need not have ultimate authority to hire or fire to qualify as an employer, so long as he or she has significant input into such personnel decisions." *Kauffman*, supra at 185 (citations omitted).

Defendant argues that Lott, the alleged harasser, was not a supervisor of Plaintiff, because Lott was an hourly bargaining unit employee of Defendant whose role was to represent line workers on behalf of the union, reported to Defendant's managers, was paid by Defendants, and did not have the authority to make personnel decisions or to arrange work schedules or pay rates.

However, there are material issues of fact that must be determined before this Court can draw a legal conclusion as to whether Lott was a supervisor.

Initially, Plaintiff does not accuse only Lott of sexual harassment, but also Frazier, an employee of Defendant who had control over several employment conditions, including job assignments of other employees such as Plaintiff. There is a factual dispute as to what extent Frazier contributed to the alleged quid pro quo arrangement between Plaintiff's job placement and Plaintiff's willingness to acquiesce to Lott's alleged advances, because of the apparently friendly relationship between Lott and Frazier. Additionally, Plaintiff has introduced evidence that does not name Frazier specifically, but does indicate that an initial investigation by the Defendant company revealed at least an implication that Lott had sought and arranged "'easy' jobs [for Plaintiff] . . . during the course of their relationship." Plaintiff's Exh. 3 at DC-1279 (filed under seal). If Lott had the ability, either through his friendship with Frazier or some other means, to threaten or induce Plaintiff to engage in relations with Lott in exchange for favorable employment conditions, Lott would have had significant input into Plaintiff's employment conditions, making Lott a "supervisor" for purposes of a quid pro quo sexual harassment claim. This important point creates a genuine issue of material fact and warrants examination at trial by a fact-finder.

**2. Hostile Work Environment**

To prove a claim of hostile work environment harassment, a plaintiff-employee must show that:

> 1) the employee was a member of a protected class; 2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; 3) the harassment complained of was based upon sex; 4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected

12

>seriously the [psychological] well-being of the plaintiff; and 5) the existence of respondeat superior liability.

*Kauffman*, supra at 183 (citations omitted).

Defendant argues that (1) the alleged harassment was not based on sex, (2) the alleged harassment was not severe or pervasive, and (3) Defendant promptly and appropriately acted in response to Plaintiff's complaints. Def. Br. at 34-40. This Court finds that there are genuine issues of material fact with regard to whether the alleged harassment was severe or pervasive, and whether Defendant promptly and appropriately acted in response to Plaintiff's claims of harassment.

In order to find a hostile work environment, "both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive. *Bowman,* 220 F.3d at 463. The Sixth Circuit explained the factors to be considered in determining whether a plaintiff has established the existence of a hostile work environment as part of her prima facie case:

>The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment. "The issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile work environment case, but whether – taken together – the reported incidents make out such a case." . . . Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Id.*

Defendant argues that the two incidents Plaintiff complains of (the "lunging" and the "standing too close" incidents) are too isolated to constitute pervasive conduct. Plaintiff contends, however, that these are merely two incidents in a longer history of harassing conduct that included excluding Plaintiff from work positions unless she agreed to engage in relations with Lott going back to at least 2004, when Plaintiff claims to have heard a conversation between Torrence Fraizer and another employee indicating that they were reluctant to accommodate Plaintiff's return to the engine line where Lott worked. This alleged pattern is thus alleged to have begun long before the May 10, 2005 "lunging" incident and the July 25, 2005 "standing too close" incident.

Even with regard to those two incidents, the parties have varying versions of what happened. In the "standing too close" incident, parties disagree as to whether Lott stood within arm's distance of Plaintiff in an attempt to intimidate her. *Compare* Weber Affidavit, Exh. B at DC-2888 - DC-2889, *with* Sanders Depo. at 561-63, 571. As for the "lunging" incident, Defendant claims that Lott walked by, waved at, and said "Hi, Mee" to Plaintiff. Drill Affidavit ¶5-6. Plaintiff claims Lott lunged at Defendant by surprise from behind her, waving his right arm in a threatening manner, hitting a tool she was working with, and yelling "Hi, Mee." Sanders Depo. at 504-05; Def. Exh. S. Plaintiff clearly subjectively regarded these actions as abusive, and she called several parties including local police when these incidents occurred. By establishing facts in the light most favorable to Plaintiff, Plaintiff may also be able to prove to a trier of fact that she objectively viewed these incidents and abusive and threatening because the lunging was by surprise and accompanied by physical contact. Therefore, a genuine issue of material fact exists and summary judgment on this issue is inappropriate at this juncture.

Finally, there is a genuine issue of material fact as to what actions taken by the Defendant are argued to have constituted prompt and appropriate reactions to Plaintiff's complaints. As described above, Defendant arranged meetings, interviewed witnesses, provided a companion for Lott during the line check, and took other measures. Plaintiff points out, however, that despite all the notorious acrimony between Lott, Frazier, and Plaintiff, Defendant continued to tolerate a condition in which Lott could communicate with Plaintiff and get close enough to stand near her on the floor. Defendant argues both that it took remedial measures and that it instructed Lott to treat Sanders like any other employee. What actions were cumulatively taken with the aim of defusing the tension on the floor is an important factor in determining if the Defendant acted promptly and appropriately to Plaintiff's claims of sexual harassment and discrimination.

**IV. Conclusion**

For the foregoing reasons, the Court hereby grants partial summary judgment in favor of Defendant with regard to Plaintiff's claims of employment discrimination based on disability and gender, but denies summary judgment with regard to Plaintiff's claims of sexual harassment, both quid pro quo and hostile work environment.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE